# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PACKAGING ENGINEERING, LLC, | ) |
| Plaintiff, | ) |
| v. | ) C.A. 08-170 Erie |
| WERZALIT OF AMERICA, INC., and WERZALIT GmbH + Co. KG, | ) |
| Defendants. | ) |

## OPINION

Presently before the court is a motion for summary judgment by Defendant Werzalit GmbH + Co. KG ("Werzalit-Germany") (Doc. 35) and brief in support thereof. Plaintiff Packaging Engineering, LLC ("PE") has filed a brief in opposition, to which Werzalit-Germany has responded. For the reasons stated herein, we will grant the motion.

## I. Background

The general facts are not in dispute unless otherwise noted. PE is in the business of providing packaging and shipping solutions to manufacturing businesses, such as those involved in the automotive industry. Defendant Werzalit of America, Inc. ("Werzalit-America"), a Pennsylvania corporation with its principal place ob business in Bradford, Pennsylvania, is a wholly owned subsidiary of defendant/movant Werzalit-Germany, a German business entity. Defendants both are in the business of designing and manufacturing wood products, including products molded from pressed wood strands.

This dispute arises out of a contract between PE and Werzalit-America, for the

1

production of tooling for a prototype container or crate that PE was developing for its customer, Pilkington plc. Pilkington is a global manufacturer of glass automobile windshields.

In early 2004, Russell G. Hall, president of PE, and John Selz, a business associate, began development of the pressed wood container. On June 9, 2005 PE entered into a Container Development Agreement and Supply Agreement with Pilkington. Under the terms of the agreement, PE agreed to complete the development of the pressed wood container with Pilkington's assistance and to produce and supply the container in specified volumes to Pilkington. These containers were intended for storing and/or shipping automotive windshields.

In September 2005, PE began discussions with Werzalit-America[1] to produce the tooling to manufacture the container and to supply the containers. PE advised Werzalit-America that PE had a contract with Pilkington for the guaranteed sale of a minimum of 150,000 pressed wood containers over a four-year period..

According to PE, Werzalit-America assured plaintiff that it could produce the tooling and manufacture said wood containers to fulfill the requirements of plaintiff's customer. In his deposition, Russ Hall described the initial meeting with Alan Ramsey, president of Werzalit-America. Hall stated that Ramsey represented that Werzalit-America was in the process of acquiring technology that would allow it to produce containers that met Pilkington's objectives. Like Inca/Litco, however, Werzalit-America declined to enter into a Container Development

---

[1] PE had presented the concept of the specialized automotive windshield container to a company known as Inca/Litco, in an effort to have Inca/Litco complete the prototype crate and necessary tooling for the crate. The relationship between Inca/Litco and PE was severed on September 13, 2005, after Hall concluded that they could not satisfy the requirements necessary for the crate production.

2

Agreement.

On November 3, 2005, representatives of PE, Pilkington and Werzalit-America attended a meeting at one of Pilkington's plants for the purpose of reviewing a prototype windshield container produced by Werzalit-America. William Skilliter, an employee of Pilkington who negotiated the Container Development and Supply Agreement with PE, and who was centrally involved in the project, stated in the minutes from the November 3, 2005 meeting:

> [The] prototype review went well... Werzalit presented their perspective and commitment to achieving a quality product that will meet Pilkington's objectives but would not concede to compressing the timing to completion. They commented that a project of the magnitude would typically take 9-12 months and they have already compressed their schedules to 5 months and are still committing to having boxes and production ready by march 2006. Further compression is not feasible without jeopardizing the quality of the engineering or design. They also commented that their owner and stockholders are aware of the Pilkington project and are extremely committed to working with Pilkington on a worldwide platform.

This email was sent by Skilliter of Pilkington, not by any representative of Werzalit-Germany. Furthermore, the recipients on the email (Hall, Ramsey and Graves – an employee of Werzalit-America in Bradford, Pennsylvania) do not include anyone from Werzalit-Germany.

On January 31, 2006, Werzalit-America issued a Quotation and Order Confirmation in the amount of $300,000 to be paid in four increments. The quotation was for one machine tool set, including engineering, to produce the prototype crate designed for windshield transportation. Plaintiff verbally accepted this quotation and Werzalit-America issued an Order Acknowledgment to plaintiff relating to their agreement. The Order Confirmation issued by Werzalit-America on February 24, 2006 provided that Werzalit-America was to use its "best efforts" to produce tooling for the crate. Wezalit-Germany was not a party to the quotation.

Hall admitted that all of his negotiations concerning a possible contract were with Alan

3

Ramsey, President of Werzalit-America. When PE issued the purchase order on the project, it was issued to Werzalit-America; likewise, PE's Order Confirmation was received from Werzalit-America, not Werzalit-Germany.

Werzalit-America required that the tool die set remain in its possession so that it could manufacture the wood containers. Between February 24, 2006 and December 31, 2006, pursuant to the terms of the contract, PE apparently paid defendant Werzalit-America $232,000 toward completion of the tool set.

According to the plaintiff, it was represented to PE and Pilkington that Werzalit-Germany was actively engaged in moving the project forward. PE points to a number of representations and instances in support of this contention. For example, Werzalit-Germany was conducting structural tests in Germany for the purpose of confirming the strength capabilities of the windshield container. During the early part of 2006, Werzalet-Germany assigned Martin Dietz, its "vice-president of design," to undertake the formulation of the adhesive that would be used to bind the wood strands for creating the components of the windshield containers. Russ Hall testified that a proper adhesive formula was essential to the development of the container and that Mr. Dietz was the only person working on the formula.

According to plaintiff, in the summer of 2006, PE and Pilkington discovered that Werzalit-America had misrepresented the progress it had made on the tools, and in fact, had actually refused or become unable to pay the subcontractor it had hired to cut the tool set.

In September 2006, Alan Ramsey of Werzalit-America contacted Russ Hall and informed him that Werzalit-America was suspending any further work on the project. Russ Hall and John Selz then contacted Jochen Werz, the CEO of Werzalit-Germany, to confirm Werzalit-

Germany's commitment to the project. When asked to clarify his understanding of which defendant Werz was speaking for that day, Hall testified that he believed that Jochen Werz owned both Werzalit-America and Werzalit-Germany and that, although Hall knew they were separate corporations, he did not distinguish between them.

During the phone call in September 2006, Hall and Selz conveyed that they thought it was Werz's obligation (according to PE, Werz, in his role as the leader of the "entire" entity, Werzalit-Germany and Werzalit-America) to step forward and provide whatever financing that Alan Ramsey of Werzalit-America needed to advance the project. According to Hall, Werz said "that *he* would do everything that *he* could to maintain the program and advance it."(emphasis added). Hall understood that Werz was also committing to providing technical support to his American subsidiary. He stated that when "we got off the phone, John and I felt much better. We felt that, okay, this guy is going to step up and take more of an interest in this. . . . Support Alan Ramsey's operation and move it forward." However, Hall admits that Werz never said "that Werzalit KG is going to support Werzalit of America" and further, that no one ever promised or admitted that Werzalit-Germany would guarantee the performance of Werzalit-America or carry out portions of the contract performance itself. According to Werzalit-Germany, these general statements and communications cannot be construed as an offer for Werzalit-Germany to take over the project.

According to PE, when Werzalit-America announced in September 2006 that it would not perform its contractual obligations, Hall wrote to Dietz, inquiring about the support that Werzalit-Germany previously promised to provide for the project. This email, dated September 13, 2006, states that "John [Selz] and I [Hall] believe that corporate Werzalit needs to provide

5

Werzalit of America support on this program or the program may be in jeopardy." The email does not refer to any promise made by Werzalit-Germany, however.

In November 2006, Werz participated in a conference call with Hall, Selz and Ramsey. According to the plaintiffs, during the call Mr. Werz again expressed his commitment to the container project and indicated that Werzalit-Germany was considering pulling the equipment used to manufacture the containers to Germany for further development. Notes of this conversation were prepared and circulated among participants, and state in part: "Mr. Werz plans to move the ... project to Germany where his engineering resources are. He plans to put Martin Dietz in charge of the project." Martin Dietz was a vice president at Werzalit-Germany and was the same individual who had been involved in formulating the adhesives to be used in manufacturing the containers. Representatives of both PE and Pilkington would regularly turn to Martin Dietz to seek information, support or direction regarding the project.

When Werzalit-America announced in September 2006 that it would not perform its contractual obligations, Mr. Hall wrote to Mr. Dietz, inquiring about the support that Werzalit-Germany had previously promised to provide for the project. Mr. Deitz had similar discussions with representatives of Pilkington, such that Skilliter was lead to believe that Werzalit-Germany would provide engineering resources, financial resources, and labor to come in and install the equipment. According to Skilliter, during a conference call with Dietz, he made it clear that he expected "to step in and give either the financial resources to hire the contractors or pull people from different areas in their organization to make things happen, because it was being stalled." Skilliter also testified that in September 2006, Mr. Dietz commented that Werzalit-Germany needed to take the project over and move it to Germany and "develop it our way."

Bruce Miller, a mechanical engineer – at Pilkington – testified that he attended a meeting on November 17, 2006, in which Martin Dietz participated, during which the progress of the project was discussed. According to Miller, Dietz stated that "he had the technical people in Germany to progress the project and he would take that back to Germany." Miller understood that Werzalit-Germany would provide production assistance such as equipment to be used to fabricate boxes. Werzalit-Germany aptly notes that it is not even mentioned by name in any of the statements, and that none of the statements includes a promise by Werzalit-Germany to undertake any specific course of action. The minutes of this meeting state, "Process design and prototyping of process to be done in Germany due to limited resources in Bradford."

In January 2007, plaintiff was advised by defendant, Werzalit-America, that it was abandoning its efforts to complete the project. Jochen Werz had instructed Alan Ramsey to terminate the project. PE's subsequent efforts to produce a production version of the crate using other suppliers failed. To date, PE has never produced a practical production version of the crate.

PE alleges that Werzalit-Germany's repudiation of its obligations was a material breach of the contract and that plaintiff has suffered a loss of its tooling payments in the amount of $232,000 plus lost profits relating to the sale of the wood containers in an amount in excess of $1,000,000.

On August 27, 2008, Werzalit-Germany filed a motion to dismiss on the grounds that its alleged promise to guarantee the performance of Werzalit-America 1) was not in writing and therefore violated the statute of frauds; and 2) was not supported by adequate consideration. We denied the motion to dismiss in an Opinion and Order dated November 1, 2008, and the case proceeded to discovery.

Werzalit-Germany has filed a motion for summary judgment, arguing that plaintiff PE failed to produce any evidence that Werzalit-Germany promised to guarantee the contractual obligations of Werzalit-America. Plaintiff argues that based on the consistent testimony of the individuals involved in the project, Werzalit-Germany promised that "it would stand behind and guarantee" the performance of defendant, Werzalit-America, and if necessary carry out portions of the contract performance itself.

## II. Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c), Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Summary judgment may be granted only if the moving party establishes that there exists no genuine issue of material fact and that it is entitled to judgment as a matter of law. Id. Summary judgment is appropriate only when the record evidence could not lead a reasonable jury to find for the non-moving party. Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248-249 (1986). In evaluating a motion for summary judgment the court does not weigh the evidence or make credibility determinations. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150 (2000). Rather than evaluating the evidence and determining the truth of the matter, the court determines whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. In reviewing the evidence, the court draws all reasonable inferences in favor of the non-moving party. Reeves, 530 U.S. at 150; Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).

## III. Discussion

Defendant Werzalit-Germany has filed a motion for summary judgment on the grounds that the action is barred by the statute of frauds and that any alleged promises by Werzalit-Germany to guarantee the performance of Werzalit-America are not supported by consideration.

The Pennsylvania Statute of Frauds states as follows:

### § 3. Promise to answer for debt of another

No action shall be brought . . . whereby to charge the defendant, upon any special promise, to answer for the debt or default of another, unless the agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some other person by him authorized.

33 P.S. § 3. ). A written memorandum is required in order to enforce a promise to pay the debt of another under Pennsylvania law. 33 Pa. Cons. Stat. Ann. § 3; Leonard v. Martling, 106 A.2d 585 (Pa.1954). However, the statute of frauds rule that a promise to answer for the debt of another must be in writing does not apply where the main object of the promisor is to serve his own pecuniary or business purpose. See, Biller v. Ziegler, 593 A.2d 436, 440 (1991) and cases cited therein.

Werzalit-Germany therefore argues that any alleged promises by Werzalit-Germany to guarantee the performance of Werzalit-America were verbal expressions (allegedly made well after the parties entered their agreement) and fails to satisfy the requirements of the statute of frauds. Werzalit-Germany argues that because PE admits that no writing exits to support its claim against Werzalit-Germany, and further, because Werzalit-Germany never offered or agreed to guarantee the performance of Werzalit-America the statute of frauds does not come into our analysis because no parol evidence exists in this case. Even so, according to Werzalit-Germany,

9

PE has produced no evidence to support any exception to the statute of frauds.

In response, PE argues, as more fully explained below, that Section 88 of the Restatement (Second) of contracts clearly contemplates the creation of an oral guarantee under principles of estoppel and that there is a genuine issue of material fact in this regard. PE argues that, consistent with our holding on the motion to dismiss earlier in this case, PE's claim is not barred by the suretyship provision of the Statute of Frauds because the leading object or main purpose of Werzalit-Germany's promise to continue with the container project and stand behind the performance of Werzalit-America was to serve its own pecuniary or business purpose.

In further support of its motion for summary judgment, Werzalit-Germany argues that these alleged promises to guarantee the obligations of Werzalit-America are not supported by consideration, and under the case law, a third party's alleged guarantee of the debt or obligation of another is unenforceable unless supported by consideration, citing Paul Revere Protective Life Ins. Co. v. Weis, 535 F. Supp. 379, 385 (E.D. Pa. 1981). Sufficient consideration to support a guaranty can exist where the guaranty is a condition precedent to a contracting party's agreement to enter into the underlying contract. Id. Werzalit-Germany argues that its alleged guaranty could not have induced PE to enter into the contract with Werzalit-America because the agreement pre-dated the alleged promise to "stand-behind" Werzalit-America's performance.

The "leading object" or the "main purpose rule:"

> 'Whenever the main purpose and object of the promisor is, not to answer for another, but to subserve some pecuniary or business purpose of his own, involving either a benefit to himself, or damages to the other contracting party, his promise is not within the statute, although it may be in form a provision to pay the debt of another, although the result of it may incidentally have the effect of extinguishing that liability, is the rule laid down in many cases, and has been consistently followed by this court.'

10

Eastern Wood Products Co. v. Metz, 89 A.2d 327, 330 (Pa. 1952), quoting Goodling v. Simon, 54 Pa. Super. 125, 127 (1913). One court has explained that the difficulty in creating a bright-line test for this rule "is that the question to be answered relates to the purpose, motive, object or desire of the promisor, and, therefor, it can only be answered by analyzing the complex objective manifestations surrounding the making of the promises." Thomas A Armbruster, Inc. v. Barron, 491 A.2d 882, 884 (Pa. Super. 1985), citing J. Murray, Murray on Contracts § 316 (2d ed. 1974).

We agree with the defendant and will grant the motion for summary judgment. We find that no reasonable jury could conclude that Werzalit-Germany promised to perform the contractual obligations of Werzalit-America. There is no evidence that either PE threatened to pull out of the project with Werzalit-America or that Werzalit-Germany attempted to convince PE to continue with the project. Likewise, there is no evidence to support the assertion that Werzalit-America's main purpose was to serve its own pecuiniary or business purpose. Although Werzalit-Germany owned 100% of the co-defendant subsidiary, Eastern Wood Products Co. v. Metz, 89 a.2d 327, 329-30 (Pa. 1952) (statute of frauds does not apply where promisor owned 100% of the corporation whose obligation he personally guaranteed), there is insufficient evidence to support the argument that this alleged promisor's main purpose for making an alleged guaranty was to serve its own pecuniary or business ends. Webb Manufacturing Co. v. Sinoff, 674 A.2d 723, 726 (Pa. Super. 1996). At most, through discovery plaintiff has found evidence that certain individuals had the impression that Werz himself wanted to help out; this is far different from whether there is a genuine issue of material fact that any specific contractual promises was ever stated by representatives of Werzalit-Germany and what, if any, its motive would have been in doing so.

11

In response to Werzalit-Germany's argument with respect to consideration, PE argues that because Werzalit-Germany reasonably should have expected that its guarantee would induce plaintiff to continue with the project and to forbear seeking damages against Werzalit-America under a theory of breach by repudiation, its agreement to do so is contractually binding. Section 88 of the Restatement (Second) of Contracts provides:

> A promise to be surety for the performance of a contractual obligation, made to the obligee, is binding if
>
> (a) the promise is in writing and signed by the promisor and recites a purported consideration; or
>
> (b) the promise is made binding by statute; or
>
> (c) *the promisor should reasonably expect the promise to induce action or forbearance of a substantial character on the part of the promisee or a third person, and the promise does induce such action or forbearance.*

Restatement (Second) of Contracts § 88 (1981) (emphasis added); see Midlantic Foods, Inc. v. Michael Rosenzweig and Feasterville Thriftway, Inc., 1987 WL 582749 (Pa. Com. Pl. Oct 02, 1987). Again, we find that PE has not shown that there is evidence that Werzalit promised to stand behind and guantee the performance of Werzalit-America. Moreover, a jury could not reasonably infer that Werzalit-Germany was attempting to induce plaintiff to continue with the project and to forbear pursuing a cause of action for abandonment and/or repudiation of its contractual obligations.

It may be undisputed that key actors such as Hall and Skilliter hoped and believed Werzalit-Germany would save the project, but the record evidences does not meet the requirement of "clear and precise evidence" of a guarantee of sorts. Berquist Co. v. Sunroc Co., 777 F. Supp. 1236, 1250 (E.D. Pa. 1991). There are general statements and communications that

12

Werz wanted to "do everything that he could to maintain the program and advance it" but there is no evidence that an agreement – offer, acceptance and consideration demonstrating an objective meeting of the minds as to definite contractual terms– was in fact ever reached. We therefore find that PE's allegations against Werzalit-Germany should not proceed to trial. Its motion for summary judgment shall be granted.

Date: July 21, 2010

Maurice B. Cohill, Jr.
Senior United States District Court Judge