# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PACKAGING ENGINEERING, LLC,  )
        Plaintiff,                    )          Civil Action No. 08-170 Erie
                                        )
        v.                               )
                                        )
WERZALIT OF AMERICA, INC.,       )          Magistrate Judge Baxter
        Defendant.                 )

## MEMORANDUM OPINION[1]

United States Magistrate Judge Susan Paradise Baxter

### A. Relevant Factual and Procedural History

This dispute arises from an abortive business arrangement between Plaintiff Packaging Engineering, LLC ("PELLC") and Defendant Werzalit of America, Inc. ("Werzalit"). PELLC claims that Werzalit breached a contract by failing to produce a "Machine Tool Set," and Werzalit counterclaims for breach of the same contract. Presently pending before the Court is Defendant's Motion in Limine [ECF No. 51].[2] The motion has been thoroughly briefed and is ripe for disposition. For the reasons that follow, the motion will be granted.

According to the Complaint, PELLC designed a novel packaging crate intended for transportation of automobile windshields. (ECF No. 1, Complaint, ¶¶ 6, 9). Pursuant to a

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c)(1), the parties have voluntarily consented to have a United States Magistrate Judge conduct proceedings in this case, including the entry of a final judgment. ECF Nos. 59, 61.

[2] The nineteenth edition to The Bluebook: A Uniform System of Citation (Columbia Law Review Ass'n, et al. eds., 19th ed. 2010) provides citation form for court documents filed with the Electronic Case Management system of the federal courts. Rule B7.1.4. Although The Bluebook advises pinpoint citation to a document's original page number, this Court finds its practice of citing to the page number contained in the PACER header more efficient and will continue its prior practice of citing to that page number herein.

1

Container Development and Supply Agreement dated June 9, 2005, PELLC agreed to supply 150,000 of these new crates to Pilkington North America, Inc. ("Pilkington") and, according to the Complaint, expected to realize $1 million in profits from this contract. (Id., ¶¶ 10, 20).

Around August 30, 2005, PELLC initiated negotiations with Werzalit concerning the crate project. (ECF No. 11, Counterclaim, ¶ 2). Specifically, PELLC solicited Werzalit to produce the "Machine Tool Set" needed to manufacture the crates after another company was unable to produce the tool design. (ECF No. 1, Exhibit A). After negotiations, Werzalit produced a written price quote for the tool set. Id. Exhibit A. And on February 22, 2006, PELLC verbally accepted the quote. Id. ¶ 13. Werzalit soon produced an "Order Acknowledgement" to memorialize the contract. Id. Exhibit B. The acknowledgement notes that PELLC was required to pay Werzalit $300,000 in four installments of $75,000. Id. Exhibit B. The acknowledgement further notes that the tool set would be completed on a "best efforts" basis. Id. Exhibit B.

Less clear is how the crates were to be assembled. In the Complaint, PELLC does not explicitly allege it had a contract with Werzalit to manufacture the crates. Instead, in its brief, PELLC suggests that there was an understanding that Werzalit would manufacture the crates after finishing the tool set:

> Mr. Russ Hall, the President of PELLC, will testify at trial that representatives of Werzalit were fully informed of the details concerning the contract between PELLC and Pilkington. In fact, Werzalit was given a copy of the Pilkington contract. Further, he will testify that he had direct discussions with the President of Werzalit, Alan Ramsey, concerning the cost for manufacturing the containers by Werzalit.
>
> \*   \*   \*
>
> In deposition testimony, Alan Ramsey, the President of Werzalit, testified that he advised PELLC that *Werzalit was prepared to manufacture the containers* at cost for the Pilkington contract (the minimum 150,000 units) because there existed the opportunity to manufacture and sell containers to a variety of other automotive windshield manufacturers.

ECF No. 52, page 2 (emphasis added). PELLC also points to a notation in Werzalit's Order Acknowledgment: "Due to the proprietary process design, the die tools will always remain at [Werzalit's] Strandwood of America, LLC facility." ECF No. 58, page 1. PELLC infers from this notation that Werzalit expected to manufacture the crates. Id.

Arrangements between PELLC and Werzalit broke down. Werzalit never produced the tool set and PELLC was unable to fulfill its obligation to produce 150,000 crates for the Pilkington contract. In this action, PELLC claims that Werzalit breached the contract and, as a result, PELLC could not fulfill its obligations to Pilkington. Among other things, PELLC seeks lost profits "in an amount in excess of $1,000,000.00," which it expected to realize from the failed Pilkington contract. ECF No. 1, ¶ 20.

### B. Defendant's Motion in Limine

On January 6, 2011, Defendant Werzalit has filed a Motion in Limine that seeks to exclude from trial all evidence of PELLC's lost profits. ECF No. 51. Werzalit argues that PELLC's claim for lost profits is impermissibly "speculative, vague or contingent." ECF No. 51, ¶ 25. PELLC counters that there is a reasonable basis for estimating its lost profits.

In Pennsylvania, "a buyer can recover consequential damages resulting from a seller's breach of contract." Glenn Distributors Corp. v. Carlisle Plastics, Inc., 297 F.3d 294, 301 (3d Cir. 2002). See also 13 Penn. Cons. Stat.Ann. § 2714(c). "Lost profits are recoverable as consequential damages in a proper case, such as where a seller knows or has reason to know that a buyer is purchasing a good for resale." National Controls Corp. v. National Semiconductor Corp., 833 F.2d 491, 495 (3d Cir. 1987). Such lost profits are recoverable "if there is (1) evidence to establish the damages with reasonable certainty; (2) they were the proximate

3

consequence of the wrong; (3) they were reasonably foreseeable." Advent Systems Ltd. v. Unisys Corp., 925 F.2d 670, 680 (3d Cir. 1991) quoting Delahanty v. First Pennsylvania Bank N.A., 318 Pa.Super. 90, 120 (1983). There is a heightened burden of proof when profits were lost in pursuit of a "new and untried business venture." National Controls Corp., 297 F.3d at 495. A survey of Pennsylvania decisional law has uncovered only a single case wherein the plaintiff was awarded lost profits on a novel business venture, and then only because the damages were clearly forseeable and "capable of proof to a reasonable certainty." General Dynafab, Inc. v. Chelsea Industries, Inc., 301 Pa.Super. 261, 266 (1982).

Werzalit's Motion in Limine primarily addresses the "reasonable certainty" prong. Regarding this prong, "[l]ost profits ... 'cannot be recovered where they are merely speculative.'" Brisbin v. Superior Valve Company, 398 F.3d 279, 289 (3d Cir. 2005) quoting Delahanty, 318 Pa.Super. at 120. "Proof of damages need not be mathematically precise, but the evidence must establish the fact with a fair degree of probability." Advent Systems Ltd. v. Unisys Corp., 925 F.2d 670, 680 (3d Cir. 1991) (internal quotations omitted). In other words, the plaintiff need not pin down lost profits with mathematical precision, but the plaintiff must show with reasonable certainty that those damages exist.

Werzalit claims that PELLC's allegation of $1 million in lost profits is "facially speculative," since PELLC never secured a contract for the manufacture of the crates. ECF No. 51, page 5. Without this contract, Werzalit contends, PELLC could never be assured that it could fulfill its obligations to Pilkington. And without this assurance, the profitability of PELLC's business arrangement with Pilkington was never reasonably certain.

PELLC counters that there was an expectation, although apparently not memorialized in any contract, that Werzalit would manufacture the crates after tooling was complete. Because of

4

this expectation, and because Werzalit was aware of the Pilkington contract and PELLC's obligations thereunder, PELLC's lost profits were a foreseeable result of failing to produce the tool set.

Importantly, Werzalit cannot breach a contract it never entered into. Nor can Werzalit be liable for lost profits on a manufacturing contract that never existed because it allegedly breached a **tooling** contract. Perhaps anticipating this argument, PELLC counters,

> [R]egardless of who would manufacture the crates, defendant's failure to complete the tooling and its repudiation of the contract to complete the tooling, gives rise to a claim for consequential damages by PELLC. Defendant, Werzalit, was fully aware of the relationship between Pilkington and PELLC and the desire and commitment by Pilkington to acquire 150,000 of the windshield crates.

ECF No 58, page 3. Yet, this was a novel business venture, so it is not reasonably certain that PELLC would have fulfilled its obligation to Pilkington even if Werzalit successfully produced the tool set. It was merely incumbent upon Werzalit to produce the tooling on a "best efforts" basis, with no promise of a specific date for completion of the tooling or costs associated with production. Thus, there was never any assurance that the Pilkington contract would still be in existence at the time the tooling was completed.

Moreover, any profit from the Pilkington Agreement was contingent on numerous factors, including the successful design of a crate and a production cost that would be acceptable under the Pilkington Agreement. As between PELLC and Werzalit, the production cost of the containers was never defined beyond Mr. Ramsey's apparent verbal estimate that Werzalit would manufacture the containers "in the mid $40.00 range." (ECF No. 52 at p. 3). Conversely, although the Pilkington Agreement estimated a target price of $49.51, PELLC and Pilkington expressly acknowledged that, given "the [then] current stage of design and development of the container, world markets, cost and availability of raw materials, and other factors beyond [the

5

parties'] control … it [was] impossible to …. identify a definite production unit price sale for the container." (ECF NO. 56-2, Pilkington Agreement, ¶ 7). Thus, while Pilkington's obligation to purchase crates from PELLC was contingent on PELLC's ability to meet Pilkington's "target price" requirement, there was never any assurance that Werzalit would or could produce a crate at a cost that would allow PELLC to meet such requirement. More importantly, Werzalit never expressly agreed to do so. Without "concrete" arrangements requiring Werzalit to actually produce the crates at a specified production cost that would allow PELLC to profitably meet Pilkington's target price, PELLC's claim for lost profits is nothing more than speculative. See National Controls Corp., 297 F.3d at 497; Lockheed Martin Corp. v. Bell Atlantic Directory Graphics, 1997 WL 698491, at *4 (E.D.Pa.) ("As [plaintiff's] claims for lost profits are based on anticipated business relationships which were not concrete [...] [plaintiff's] claims for lost profits are dismissed as speculative.").

Accordingly, the motion in limine will be granted. This discussion renders moot the parties' arguments concerning the statute of frauds.

An appropriate Order follows.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PACKAGING ENGINEERING, LLC,** | ) | |
| Plaintiff, | ) | Civil Action No. 08-170 Erie |
| | ) | |
| v. | ) | |
| | ) | |
| **WERZALIT OF AMERICA, INC.,** | ) | Magistrate Judge Baxter |
| Defendant. | ) | |

O R D E R

AND NOW, this 12<u>th</u> day of August, 2011;

IT IS HEREBY ORDERED that the motion in limine filed by Defendant [ECF No. 51] is GRANTED.

/s/ Susan Paradise Baxter
SUSAN PARADISE BAXTER
United States Magistrate Judge
